[Civ. No. 14760. First Dist., Div. One. Oct. 29, 1951.]

ANTONIO J. ALMEIDA et al., Appellants, v. MARY PRICE et al., Respondents.

Haig T. Toomajian and J. Elwood Andresen for Appellants.

Richards & Rankin and Albert K. Whitton for Respondents.

BRAY, J.—Plaintiffs brought an action for specific performance of an option to purchase contained in a lease. Judgment went for defendants. Plaintiffs appeal.

### QUESTIONS PRESENTED

1. Sufficiency of the evidence.
2. Sufficiency of the finding on estoppel.
3. The liability of the remaindermen, rather than the life tenant, for taxes and insurance.

### RECORD

Plaintiff Antonio is the son of defendant Mary Price. Plaintiff Margaret is his wife. Defendants Joseph and Rose are the brother and sister respectively of Antonio and the children of Mary. The complaint alleged the making of a lease by Mary to plaintiffs of a certain improved lot in Berkeley, owned by her, for a five-year period, containing an exclusive option to purchase for $3,500 before the expiration of the lease; the conveyance of the property by Mary to Antonio,

Joseph and Rose, reserving a life tenancy in herself; the exercise of said option by plaintiffs; and the refusal of defendants to comply with the option, and a prayer that defendants be required to fulfill the option. Defendants filed an answer and cross-complaint alleging that the title to the property was in the three children, subject to a life estate in the mother, and that, in effect, plaintiff Antonio had obtained the lease by imposing upon the confidence of his mother in him. ■ The court found, among other matters, that by deed dated September 19, 1941, the mother conveyed the property to the three children, reserving a life estate; that the deed was not recorded until April 5, 1945; that on April 10, 1944, plaintiffs and Mary entered into a five-year lease of the premises with a monthly rental of $50; that included in the agreement was the option to purchase; that ever since the date of the deed it was the intention of Mary that the property was to vest in the three children upon her death; that there was no effective delivery of the deed until April 5, 1945, but that at all times since the date of the deed Mary believed it had become and was effective; that at the time of the execution of the lease she had confidence in Antonio, and did not know nor was it ever discussed or explained to her that the option was in the lease; that had she so known she would not have executed the lease; that in executing it she acted in full reliance upon the belief that Antonio would fully explain to her anything in it which might destroy the effectiveness of the deed, the terms of which Antonio knew ever since its execution; that the option is not valid or enforceable; that plaintiffs, while in possession under the lease, had made repairs and additions to the value of $1,807.37, and that Joseph had expended $131.68 for taxes and insurance. The judgment quieted title in the property in the three children, subject to the mother's life estate, and found that each of the three remaindermen were liable for one-third of the expenditures for repairs, taxes and insurance. It then gave a lien in favor of plaintiffs on the interests of the other two remaindermen for one-third of plaintiffs' expenditures for repairs, and a lien in favor of Joseph on the interests of plaintiffs and Rose for one-third of the expenditures for taxes and insurance.

### Sufficiency of Evidence

An examination of the transcript shows that there is ample evidence to support the court's findings. Plaintiff* testified

---

*In discussing the evidence, the word "plaintiff" will refer to Antonio unless otherwise noted.

that in September, 1941, his mother requested that he have a deed prepared for her to sign. He then instructed her attorneys to prepare it. It was a deed of gift to the three children, reserving a life estate. His mother signed it about September 19, in his office in the presence of Harry Bloom, who was a good friend of plaintiff's, both plaintiffs, and an employee of plaintiff. The deed was not acknowledged because his mother did not want it to become effective until her death. His mother handed it to plaintiff asking him to keep it in her file, which he did, keeping it there until August 20, 1944, when he turned the contents of the file over to Joseph. The lease was prepared by Mr. Bloom at plaintiff's request, and was signed by his mother at her home in the presence of plaintiff and Mr. Bloom. Mr. Bloom read and explained it fully to her. (This is denied by the mother. Moreover, Mr. Bloom testified that he merely read it to her and did not explain it.) Plaintiff and Mary had discussed the option a dozen times theretofore. (This Mary denied.) Plaintiff did not discuss the lease or option with his brother or sister, although he knew that his mother always wanted the property to go to the three children.

Mr. Bloom, an insurance and real estate broker and notary public, testified that he read the lease to Mary but he did not recall any discussion with her of the option provision. At Antonio's request he had the lease and option prepared without discussing the matter with Mary.

Plaintiff Margaret testified to being present at the signing of the deed and that Mary said she wanted it definitely understood that the property was still hers; she would receive the rents, and that after her death the property would belong to the three children. Mary gave the deed to Antonio to put in her file, which he did.

Mary testified that she had asked Tony to get a deed prepared dividing the property into three parts and then to keep the deed and record it after her death. After signing the deed she handed it to Antonio. He kept it in his file. Antonio had been renting the property from her at $50 per month for a month or so before the execution of the lease. Mr. Bloom and Tony came in to her place, with two papers. Tony told her to sign. She said she would not because he did not read it to her or let her read it. He shook his fist at her and said she had to sign it. She was afraid of him and Mr. Bloom, so she signed. A lease had not been discussed beforehand. She did not know there was an option to buy in the lease. Plaintiff and Mary were friendly at the time.

While it is doubtful if the court believed that plaintiff threatened his mother at the time of signing the lease, the evidence well supports the conclusion that the mother did not know that the option was in the lease when she signed it. Her testimony that she did not, coupled with Mr. Bloom's testimony that he merely read the lease to her and did not explain it (refuting plaintiff's statement that he did), with the background of the signing theretofore of the deed to all three children, amply supports the conclusion that the mother did not know or realize that the option was there. Both plaintiffs testified that they knew that the mother wanted the property to go to all three children. Plaintiff also testified: "THE WITNESS: I might say that the lease was made around the deed. We were aware of the deed when we made the lease. THE COURT: As far as you knew, your mother always wanted to see the property go to you three children when she died? THE WITNESS: That's correct. THE COURT: She never changed her ideas about that, did she? THE WITNESS: Not one bit." Certainly the relationship between mother and son and the fact that the son knew what his mother wanted done with the property requires a clear and unmistakable showing that the mother definitely knew of the option and that its effect would be to overthrow completely her intended disposition of the property. Those facts required that she have independent advice. (See 37 C.J.S. § 35, p. 283; 12 Cal.Jur. 772; 6 Cal. Jur. § 43, p. 75.) Here the lease containing the option was drawn under instructions of the son; it was signed in the presence of the son and his friend (who states that it was not explained); the brother and sister who by the mother's wishes would receive two-thirds of the remainder were kept in ignorance of the option, and no independent advice was received by the mother. The situation was fraudulent on its face. The fact that the price set forth in the option was the then fair value of the property (and the court so found) does not change the situation. It is clear from the testimony of the plaintiffs as well as the mother that the mother wanted to keep the property for her life and then to have it go to the three children. The fact that the price set by plaintiff was a fair one makes his act in obtaining the option without a full and fair disclosure no less a fraud.

■ Plaintiffs quote from *Leathers* v. *Leathers*, 77 Cal.App. 2d 134, 141 [174 P.2d 875] : "The significant factors in a case of this kind are the adequacy of the consideration and the general fairness and mutuality of the transaction . . .; and where no injury has been suffered by reason of the influence

complained of and there has been no abuse of the confidence reposed, the transaction will not be set aside.'' They contend that this statement is authority for the proposition that because the amount inserted in the option was the then fair market price of the property, there was no abuse of the confidential relationship. Such a conclusion overlooks all of the factors in the above quotation except, possibly, adequacy of consideration. There can be no ''mutuality'' where one party to a contract knows nothing of its provisions, and is required to sell when she does not want to, even at a fair price. Again, forced sale is an ''injury'' and failure to disclose what is in the contract is an ''abuse of the confidence reposed.''

During and at the end of the trial the judge made statements concerning plaintiff's actions that are inconsistent with his findings and judgment. ■ It is well settled that the remarks of the trial judge cannot control over his findings. It is to the latter that this court must look, and if they are supported by the evidence, the judge's remarks inconsistent therewith have no effect. (See *Department of Social Welfare* v. *Machado,* 98 Cal.App.2d 364 [220 P.2d 411].)

### ESTOPPEL

In their answer to the cross-complaint plaintiffs pleaded that Mary was estopped from attacking the lease ''due to the fact that she has retained all payments made pursuant to said lease in accordance with its terms well knowing all the terms and provisions thereof.'' ■ Plaintiffs contend that the judgment should be reversed because of the failure of the court to find directly on this issue. The court did find that at the execution of the lease Mary did not know of the option provision and that she had trust and confidence in her son. While it would have been better for the court to have made an express finding of when Mary gained knowledge of the option and that by accepting the rent she was not estopped to deny the option, under the peculiar circumstances of this case, such a finding is not indispensable. ■ The acceptance of the rental could not have misled plaintiffs into believing that Mary was willing to let the option stand. They had been renting the property for $50 per month and under the lease continued to pay that sum which the court found was the reasonable rental value. Defendant Joseph testified that he discovered the option clause in August, 1944, and consulted an attorney about it. There is no evidence that Mary knew of it at this time. But even if she had, the acceptance of the rent for some time afterwards and the failure to do anything about it would not work

an estoppel as plaintiffs were getting value received for the monthly payments. It might be pointed out that plaintiffs were not injured by Mary's failure to attack the option immediately, if she knew of it, as they were subleasing the property for the same rental they were paying Mary. The circumstances of this case do not bring it within the rule of *Hayes* v. *Khinoo*, 1 Cal.App.2d 572 [37 P.2d 133]. Plaintiffs made improvements. However, the bulk of these were made prior to August, 1944, when plaintiffs contend that Mary, through Joseph, learned of the option. Mary knew of these when made. This fact could not create an estoppel, first, because it is not pleaded. Secondly, they were made prior to the claimed discovery. The knowledge of the making of the improvements was consistent with Mary's claim of lack of knowledge of the option for the reason that she had the right to assume that he was making them as remainderman having a one-third interest in the property.

## LIEN FOR TAXES

■ It is interesting that plaintiffs make no complaint of the action of the court in awarding them a lien on the interests of defendants Joseph and Rose in the property for two-thirds of $1,807.37, the cost of improvements. But they contend that the court had no right to award defendant Joseph a lien on their interest for one-third of $131.68, the cost of insurance and taxes. They point out that section 840 of the Civil Code provides that the life tenant must pay the taxes, and 26 Corpus Juris 34, section 17, states that it is the duty of the life tenant and the reversioners to insure their respective interests, or they may insure jointly. These rules have no application where, as here, the life tenant is the mother of the reversioners, and where, as here, it is plain that the reversioners never expected the mother to pay either taxes or insurance. At no time did any of the children suggest that these charges be paid by the mother. The action of the court in requiring contribution between the remaindermen for improvements, taxes and insurance was eminently fair and just.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 20, 1951. Edmonds, J., voted for a hearing.